[Cite as *Harrod Corp. v. Tiffin Univ.*, 2010-Ohio-2520.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

HARROD CORP., ET AL.,

    PLAINTIFFS-APPELLANTS,          CASE NO.  13-09-33

    v.

TIFFIN UNIVERSITY,                O P I N I O N

    DEFENDANT-APPELLEE.

---

Appeal from Seneca County Common Pleas Court
Trial Court No. 09 CV 0070

**Judgment Affirmed**

Date of Decision:    June 7, 2010

---

APPEARANCES:

    *Jacqueline M. Boney*  for Appellants

    *Laurie J. Avery and William V. Beach*  for Appellee

**SHAW, J.**

{¶1} Plaintiffs-appellants, Harrod Corp. and Dennis Harrod (collectively hereinafter "Harrod"), appeal the October 14, 2009 judgment of the Common Pleas Court of Seneca County, Ohio, granting summary judgment in favor of the defendant-appellee, Tiffin University ("the university").

{¶2} In 2006, the university began eminent domain proceedings to obtain multiple real estate parcels located at what is commonly known as 322 and 375 Miami Street in Tiffin, Ohio. At the time, the property was owned by Harrod and was being used to operate a scrap metal salvage business and impound lot. The university intended to clean up this property and make it suitable to build upon so that the university could expand its school.

{¶3} On June 29, 2006, the parties entered into a real estate purchase agreement ("the original agreement") regarding these parcels. The original agreement provided that the closing on the sale of these parcels would occur on or before October 1, 2006. It also provided that Harrod was allowed to continue to operate and control the portion of the real estate located on the north side of Miami Street until February 1, 2007, to use the impound lot on the premises until August 30, 2007, to use the portion of the premises located on the south side of Miami Street until July 1, 2008, and to use the block building on the south side until July 1, 2011, all of which was to be encompassed in a separate lease agreement to be executed at the time of closing. The original agreement also

provided that at the time of closing, the university, having conducted an environmental audit of the premises and taking the premises subject to the information contained therein, was accepting the property in its "AS IS" and "WHERE IS" condition. However, the sale was conditioned upon, inter alia, the university being approved for a grant from the Clean Ohio Assistance Fund to remediate the land from pollutants.

{¶4} The closing did not occur on or before October 1, 2006, and the parties subsequently entered into a real estate purchase agreement modification ("the modification"). The modification incorporated the language of the original agreement with five modifications to that language. Included in those modifications were that closing was to occur on or before December 31, 2006, and that Harrod was permitted to use the south side of the premises and the impound lot until February 1, 2007. The modification also provided that Harrod was permitted to remove any personal property, fixtures, and buildings from the north side until February 1, 2007.

{¶5} On December 28, 2006, a non-residential lease ("the lease") was executed by the parties for the block building on the south side of the premises. The terms of the lease provided Harrod with use of the block building from December 31, 2006, until July 1, 2011.

{¶6} Closing on the property occurred on December 31, 2006. On February 1, 2007, the university took possession of the north side of the property.

The university hired Tiffin Iron and Metal, a scrap metal business, to remove any and all items left on the north side of the property and to prepare the land to a rough grade in order for the university to rid the land of all chemical pollutants in accordance with EPA standards and to eventually build on the land. Prior to the sale of the property to the university, Tiffin Iron and Metal had operated its business on the property pursuant to an oral agreement with Harrod. As compensation for ridding the property of all items left on the property, the university permitted Tiffin Iron and Metal to retain any value it could receive for the items it removed from the property.

{¶7} Almost immediately after the university took possession of the north side, disputes between the parties arose. These disputes involved the use of portions of the property, items on different parts of the property, and access to portions of the property. The disputes eventually resulted in Harrod filing a complaint against the university in the Common Pleas Court of Seneca County on March 6, 2007 ("*Harrod I*").

{¶8} This complaint alleged three causes of actions: 1) conversion; 2) fraudulent misrepresentation; and 3) intentional infliction of emotional distress. In the complaint, Harrod referred to the original agreement, the modification, and the lease in support of his claims. In addition, Harrod attached copies of these documents to the complaint. The university filed its answer to this complaint and

counterclaimed against Harrod for conversion and trespass. The matter then proceeded to the discovery phase and various depositions were taken.

{¶9} The trial on the complaint and counterclaims in *Harrod I* was scheduled to begin on February 11, 2008. On February 7, 2008, Harrod filed a voluntary dismissal of all his claims without prejudice pursuant to Civ.R. 41(A). The trial then proceeded as scheduled only upon the university's counterclaims for conversion and trespass.

{¶10} During the trial of *Harrod I*, the parties presented several exhibits, including all of the transactional documents, various communications between counsel for the parties regarding the rights of possession and control of different portions of the property, and a number of documents regarding the grant from the Clean Ohio Assistance Fund. In addition, the parties presented the testimony of Dr. Michael Grandillo, the vice president for development and public affairs for the university who was the university's point person for the purchase of the scrap yard, Richard Farmer, who worked for Tiffin Iron and Metal during the relevant time period, the attorneys for both the university and Harrod during the negotiations, purchase, and subsequent disputes regarding the scrap yard, and Dennis Harrod.

{¶11} Numerous questions, both on direct and cross-examination, were posed regarding all of the transactional documents, the agreements made by the parties, the communications between the attorneys about the land and items on the

land, each parties' interests and rights to access and use the land and items on the land, what each party did to prevent the other party from accessing parts of the premises and items on the land, what each party did with the items found on the land, and the specifics about the disputes after February 1, 2007, between the parties.

{¶12} In short, the university's counterclaims were based upon allegations that the items left on those portions of the property that Harrod did not have the right to enter were deemed abandoned by him and became the property of the university for the university to do with as it pleased. Largely, the university was disposing of these items through Tiffin Iron and Metal, which, as previously noted, was being compensated by retaining any value it could obtain through the sale or re-use of these items. Thus, the university claimed that Harrod or someone acting on his behalf trespassed on the university's property and converted items belonging to it for his own use and/or enjoyment. In contrast, Harrod claimed that he only went on property that he was authorized to be on and only took items belonging to him.

{¶13} At the conclusion of the trial in *Harrod I*, the jury returned a verdict in favor of Harrod on the conversion claim and a verdict in favor of the university on the trespass claim, resulting in no money being awarded. The trial court entered judgment on these verdicts on February 14, 2008. No appeal from this judgment was made.

{¶14} On February 5, 2009, Harrod filed a new complaint against the university ("*Harrod II*"). In this complaint, Harrod alleged six causes of action: 1) conversion of personal property; 2) fraud in the inducement; 3) declaratory judgment; 4) breach of contract; 5) specific performance of contract; and 6) intentional interference with business relationships or contracts.

{¶15} The university filed a motion to dismiss the complaint on April 6, 2009, asserting that the complaint in *Harrod II* was barred by res judicata and that Harrod's claims in the new complaint were compulsory to the counterclaims tried and determined in *Harrod I*, pursuant to Civ.R. 13(A). Harrod filed a response in opposition to this motion on April 23, 2009. A hearing was held on this motion on April 30, 2009. At that time, the trial court, *sua sponte*, converted this motion to a motion for summary judgment and permitted supplemental briefing on the issue.

{¶16} On June 11, 2009, the university filed a motion for summary judgment, once again asserting that the complaint in *Harrod II* was barred by res judicata and that Harrod's claims in the new complaint were compulsory to the counterclaims tried and determined in *Harrod I*, pursuant to Civ.R. 13(A). Harrod filed a response in opposition to the university's motion for summary judgment, and the university filed a reply to that response.

{¶17} On October 14, 2009, the trial court granted summary judgment in favor of the university and dismissed the complaint in *Harrod II*. This appeal followed, and Harrod now asserts three assignments of error.

## ASSIGNMENT OF ERROR I

**THE TRIAL COURT COMMITTED ERROR BY FAILING TO RESTRICT ITS RULE 13(A) ANALYSIS TO THE COUNTERCLAIM IN THE ORIGINAL ACTION.**

## ASSIGNMENT OF ERROR II

**THE TRIAL COURT ERRED BY FAILING TO CONSTRUE THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO THE PLAINTIFFS-APPELLANTS, THE NON-MOVANTS.**

## ASSIGNMENT OF ERROR III

**THE TRIAL COURT ERRED BY FINDING THE CLAIMS ASSERTED IN THE HARROD II COMPLAINT TO BE COMPULSORY TO THE HARROD I COUNTERCLAIM BASED UPON THE LIKELIHOOD OF DUPLICATION OF EVIDENCE WHERE THE SAME FACTUAL AND LEGAL ISSUES ARE NOT PRESENTED.**

{¶18} Initially, we note that each assignment of error involves the issue of whether the trial court erred in granting summary judgment in favor of the university. Accordingly, we elect to address the assignments of error together.

{¶19} An appellate court reviews a grant of summary judgment de novo, without any deference to the trial court. *Conley-Slowinski v. Superior Spinning & Stamping Co.* (1998), 128 Ohio App.3d 360, 363, 714 N.E.2d 991; see, also, *Hasenfratz v. Warnement*, 3rd Dist. No. 1-06-03, 2006-Ohio-2797, citing *Lorain Nat'l. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 572 N.E.2d 198. A grant of summary judgment will be affirmed only when the requirements of Civ.R. 56(C) are met. This requires the moving party to establish: (1) that there are no

genuine issues of material fact, (2) that the moving party is entitled to judgment as a matter of law, and (3) that reasonable minds can come to but one conclusion and that conclusion is adverse to the non-moving party, said party being entitled to have the evidence construed most strongly in his favor. Civ.R. 56(C); see *Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 653 N.E.2d 1196, 1995-Ohio-286, paragraph three of the syllabus.

{¶20} The party moving for summary judgment bears the initial burden of identifying the basis for its motion in order to allow the opposing party a "meaningful opportunity to respond." *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 526 N.E.2d 798, syllabus. The moving party also bears the burden of demonstrating the absence of a genuine issue of material fact as to an essential element of the case. *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264, 1996-Ohio-107. Once the moving party demonstrates that he is entitled to summary judgment, the burden shifts to the non-moving party to produce evidence on any issue which that party bears the burden of production at trial. See Civ.R. 56(E).

{¶21} In ruling on a summary judgment motion, a court is not permitted to weigh evidence or choose among reasonable inferences, rather, the court must evaluate evidence, taking all permissible inferences and resolving questions of credibility in favor of the non-moving party. *Jacobs v. Racevskis* (1995), 105 Ohio App.3d 1, 7, 663 N.E.2d 653. Additionally, Civ.R.56(C) mandates that

summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

{¶22} Civil Rule 13(A) requires a party to plead as a counterclaim "any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." Thus, the Ohio Supreme Court has held that "[a]ll existing claims between opposing parties that arise out of the same transaction or occurrence must be litigated in a single lawsuit pursuant to Civ.R. 13(A), no matter which party initiates the action." *Rettig Enterprises, Inc. v. Koehler*, 68 Ohio St.3d 274, 626 N.E.2d 99, 1994-Ohio-127, paragraph one of the syllabus. If a party fails to assert a compulsory counterclaim, that party is barred from litigating the counterclaim in a separate action. *Id*. at 277. In addition, "it makes no difference to the application of Civ.R. 13(A) * * * that the present claim was originally filed as a complaint in the earlier action and dismissed without prejudice after the defendant filed its counterclaim." *Id*.

{¶23} In *Rettig*, the plaintiff filed a suit against a number of defendants ("*Rettig I*"). *Id*. at 274. The subject-matter of *Rettig I* involved the sale of a retail

store and allegations regarding a failure by the defendants to account for certain inventory. *Id*. at 274-75. This complaint was eventually settled by agreement of the parties, which included a provision that the two sides would each designate a person to calculate the cost value of all inventory sold and the store would be returned to the plaintiffs. *Id*. at 275.

{¶24} A second suit ("*Rettig II*") arose, wherein the original plaintiff-business in *Rettig I* and two additional plaintiffs alleged that the defendants failed to pay the sums to which they agreed in *Rettig I*. *Id*. This time, the defendants filed a counterclaim, alleging that they were owed money for certain items purchased while they were operating the store and/or in the process of returning the store to the plaintiffs. *Id*. Eventually, the plaintiffs filed to dismiss their complaint, pursuant to Civ.R. 41(A). *Id*. at 276. The trial court dismissed the plaintiffs' complaint but did not dismiss the counterclaim, which proceeded to a bench trial in favor of the defendants. *Id*.

{¶25} The plaintiffs filed a third complaint ("*Rettig III*") against the same defendants and named an additional defendant. *Id*. The trial court granted summary judgment in favor of the defendants, but this Court reversed that decision because we found "'no connection between the counterclaims [in the second suit] and the terms of the settlement agreement. * * * Thus, we conclude[d] that the counterclaims were not compulsory and that it was error on the part of the trial court to conclude that the doctrine of *res judicata* applied.'" *Id*. at 276-77.

**{¶26}** The Ohio Supreme Court reversed our decision. *Id*. at 279. In so doing, the Court established a two-prong test for determining whether a claim is compulsory: (1) does the claim exist at the time of serving the pleading; and (2) does the claim arise out of the transaction or occurrence that is the subject matter of the opposing claim. *Id*. at 277, citing *Geauga Truck & Implement Co. v. Juskiewicz* (1984), 9 Ohio St.3d 12, 14, 457 N.E.2d 827. The Court in *Rettig* then found that the claims asserted in *Rettig III* existed at the time the relevant pleadings were served in *Rettig II*. *Id*. at 278. Thus, the Court proceeded to determine whether the claims in the third suit arose out of the same transaction or occurrence that was the subject-matter of the defendants' counterclaims in the second suit. *Id*.

**{¶27}** In order to determine the second prong of the test, the Court applied the "logical relation" test, finding that this test "comports with the object and purpose of Civ.R. 13(A), *viz*., to avoid a multiplicity of actions and to achieve a just resolution by requiring in one lawsuit the litigation of all claims arising from common matters." *Id*. The logical relation test renders a counterclaim compulsory where it "'is logically related to the opposing party's claim where separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts.'" *Id*., quoting Staff Notes (1970) to Civ.R. 13 (other citations omitted).

{¶28} Further, the Court interpreted the term "transaction" rather broadly: "'It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship * * * That they are not precisely identical, or that the counterclaim embraces additional allegations * * * does not matter.'" *Rettig*, 68 Ohio St.3d at 278, 626 N.E.2d 99, quoting *Moore v. New York Cotton Exchange* (1926), 270 U.S. 593, 610, 46 S.Ct. 367. Accordingly, the Court held that "multiple claims are compulsory counterclaims where they 'involve many of the same factual issues, or the same factual and legal issues, or where they are offshoots of the same basic controversy between the parties.'" *Rettig*, 68 Ohio St.3d at 279, 626 N.E.2d 99, quoting *Great Lakes Rubber Corp v. Herbert Cooper Co.* (C.A. 3, 1961), 286 F.2d 631, 634.

{¶29} In examining the facts in *Rettig II* and *Rettig III* and applying the "logical relation" test, the Court found that the claims were logically related and that they were "offshoots of the same basic controversy between the parties over an accounting of the various rights, obligations and liabilities springing from" the sale of the retail store. *Rettig*, supra. Therefore, the Court determined that the claims in *Rettig III* were compulsory to the claims litigated in *Rettig II* and reinstated summary judgment in favor of the defendants. *Id*.

{¶30} Here, the claims in *Harrod II* undisputedly existed at the time the relevant pleadings were served in *Harrod I*. Therefore, we proceed to determine

whether the claims in *Harrod II* arose out of the same transaction or occurrence that was the subject-matter of the university's counterclaims in *Harrod I*.

{¶31} A review of the record in this case reveals that the claims asserted by Harrod in *Harrod II* are logically related to and arose out of the same transactions as the counterclaims litigated in *Harrod I*. As noted by the trial court in its entry granting summary judgment, "each and every claim between the parties herein is ultimately founded upon the various rights and obligations that spring from the [agreements] that were at issue during the jury trial in '*Harrod I*.'"

{¶32} During the trial in the first case, a transcript of which was filed as part of the record in the case sub judice, the university's claims involved questions of whether the items of personal property left on the north side of the premises by Harrod became the property of the university as of February 1, 2007, or whether it remained Harrod's personal property because it was not "real property." The claims also raised questions about what parts of the property Harrod could enter, when he could enter them, and whether he had permission to come onto other portions of the property to retrieve items. In order to answer these questions, the original agreement, the modification, the lease, and numerous communications between the attorneys for the respective sides had to be examined.

{¶33} In comparison, Harrod asserted six causes of action in *Harrod II*. The first is for conversion of personal property. In this claim, Harrod maintains that the university converted his vehicles, machinery, and equipment that were

located on the property by seizing, withholding, and/or destroying those items. In his second cause of action, fraud in the inducement, Harrod asserts that he would not have sold the property to the university if he had known that the university was going to hire and permit a rival scrap metal business to operate on the north side of the premises in competition with Harrod, who was operating on the south side of the premises. Harrod contends in his third cause of action for declaratory judgment that the university wrongfully breached its obligations of good faith and fair dealing by allowing a competitor to operate across the street from his business on the south side and wrongfully breached its obligations by erecting physical barriers on the south side to prevent his possession, use, and control of that side of the premises. In his fourth claim, Harrod asserts that the university breached its lease contract for the same reasons listed in the third claim. Harrod's fifth claim is for specific performance of contract as an alternative form of relief to his third and fourth causes of actions. Lastly, Harrod's sixth cause of action, intentional interference with business relationships or contracts, is based on all the previous actions by the university detailed in Harrod's complaint, which he contends caused his business to suffer.

**{¶34}** Despite the contentions of Harrod, everything at issue in *Harrod II* centers around the sale of the property in its entirety and what agreements were made to make that sale happen. This was also the central issue in litigating the university's counterclaims in *Harrod I*. As previously discussed, the parties

-15-

allegedly made several agreements and oral representations to one another about the sale of the entire premises, the use of the premises before and after the sale, and access to various portions of the premises both before and after the closing. None of the claims by Harrod in the second action or the university in the first action involve matters attenuated from the sale of this property or otherwise disconnected from this sale. To the contrary, each claim involves what each party believed was the agreement they had made for the sale of the property and everything on it: what each believed they had a right to, what each believed the other had promised, what each believed the other had wrongfully done, and what documents they each had in support of their respective beliefs.

{¶35} In sum, without the sale of the property and the promises/agreements made to effectuate the sale, none of the claims by the parties would have arisen. Thus, we conclude that these claims involve many of the same factual issues, some of the same legal issues, and are clearly offshoots of the same basic controversy between the parties. Therefore, the claims asserted in the complaint in *Harrod II* were compulsory to the university's counterclaims that were tried in *Harrod I*. In addition, it makes no difference that some of the present claims were originally filed as a complaint in the earlier action and dismissed without prejudice after the university filed its counterclaim. See *Rettig*, 68 Ohio St.3d at 277, 626 N.E.2d 99. Because Harrod's claims were compulsory and were not maintained in the earlier action, they are now barred by virtue of Civ.R. 13(A). See *id*.

**{¶36}** For these reasons, we find that summary judgment in favor of the university was proper. Accordingly, the three assignments of error are overruled, and the judgment of the Common Pleas Court of Seneca County is affirmed.

*Judgment Affirmed*

**ROGERS and PRESTON, J.J., concur.**

**/jlr**